UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:22-CV-00101

| | | |
|---|---|---|
| Wei Jiang, M.D | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S RESPONSE** |
| v. | ) | **IN OPPOSITION TO** |
| | ) | **DEFENDANTS'** |
| Duke University, Duke University Health | ) | **MOTION TO DISMISS** |
| System, Moira Rynn, M.D, in her | ) | |
| individual and official capacity, and Mary | ) | |
| E. Klotman, in her individual and official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME the undersigned on behalf of the Plaintiff, Wei "Jan" Jiang

("Dr. Jiang") responding to Defendants' motion to dismiss Plaintiff's Complaint

and show the Court the following:

## STANDARD OF REVIEW OF RULE 12(b)(6)

Defendants have moved to dismiss Plaintiff's claims under Title VII, the

ADEA, and §§ 1981, 1985 under Rule 12(b)(6). "A motion to dismiss under

Rule 12(b)(6) 'challenges the legal sufficiency of a complaint,'" *Francis v.

Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009), but "[d]ismissal under Rule

Case 1:22-cv-00101-LCB-JEP   Document 9   Filed 05/09/22   Page 1 of 33

12(b)(6) is appropriate only when the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," *Clark v. Guilford Co., NC*, No. 1:16CV1087, 2017 WL 4357451, at *2 (M.D.N.C. Sept. 30, 2017)(quoting *Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 300 (M.D.N.C. 2015). Plaintiffs do not need to forecast sufficient evidence to prove each claim or even show that the right to relief is probable but must only "allege sufficient facts to establish" the elements of its claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)).

Employment discrimination complaints must meet the plausibility standard; however, the plaintiff is not required to make out a *prima facie* case of discrimination or satisfy any heightened pleading requirements at the motion to dismiss stage. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015). The Fourth Circuit has recently warned against too stringent treatment of discrimination claims due to "information-asymmetry, prediscovery." *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir.), *cert denied*, 138 S. Ct. 558 (2017).

The documents referred to in Plaintiff's Complaint and those Defendants' have attached to their Memorandum in Support of their Motion to Dismiss can be considered by the Court but should not be credited as true. *See Goines v. Valley Cmty. Servs. Bd.,* 822 F.3d 159, 167 (4th Cir. 2016 (*citing N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir.1998)). "The purpose for which the document is offered is particularly important where the document is one prepared by or for the defendant . . . [because] [s]uch unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.* at 168. Plaintiff has not adopted and indeed contests the statements in these documents because they were self-serving examples of the discriminatory treatment of Plaintiff.

Defendants' statement that "Dr. Jiang has alleged no facts," (DE6) to support her allegations of discrimination is untrue. In fact, Plaintiff's Complaint contains dozens of factual allegations all of which raise more than a speculative inference of discrimination, and all of which make it not just plausible, but probable, that Defendant Rynn magnified miniscule

documentation issues in the REMIT study and then when those were corrected, she urged a misinterpretation of the science behind it because of her discriminatory animus towards Plaintiff, which conduct was ratified by Defendants.

## STATEMENT OF FACTS TAKEN AS TRUE

Dr. Jiang is a Professor of Psychiatry and Behavioral Sciences at Duke and conducts research at Duke University Medical Center. DE1 ¶¶ 14-17. Dr. Jiang has been employed by Duke since 1989 and became a tenured Full Professor in 2014. DE1 ¶¶14-15. Between 2006 to 2011, Dr. Jiang served as the "Principal Investigator" for a federally funded research study, "Responses of Myocardial Ischemia to Escitalopram Treatment" (the "REMIT Study"), which investigated the effects of certain anti-depressant and anti-anxiety medication on a certain type of heart condition. DE1 ¶¶18-19.

The REMIT study was active between September 2006 and 2011. DE1 ¶18. Dr. Jiang and her co-investigators authored papers based on the research done in the study that were published in prestigious medical journals, including the Journal of the American Medical Association (JAMA). DE1 ¶¶23-25. Dr. Jiang also applied for additional grants which the NIH approved

-4-

in 2018, but which Defendant Rynn later cancelled.  DE1 ¶¶53, 64.

Six years after the conclusion of the REMIT study, in July 2017, Defendant Rynn became chair of the Department.  DE1 ¶8.  Rynn was neither an accomplished researcher[1] nor a tenured professor. DE1  ¶37.  Defendant Klotman, who ratified Defendant Rynn's actions, became Dean of the Medical School at the same time.  DE1 ¶9.  When Defendant Rynn became department head, Plaintiff's annual salary was approximately $200,484. DE1 ¶28.

Beginning in 2004, and until Defendant Rynn refused to allow her to do so in 2019 , DE1 ¶¶93, 95, as part of her outreach activities as a faculty member in the Duke Psychiatry Department, Dr. Jiang made annual and sometime biannual trips to China to collaborate with colleagues, provide mental health outreach, and attend and present at conferences. Dr. Jiang also visited family on these trips.  DE1 ¶16.

In 2018, seven years after the close of the REMIT study, Plaintiff undertook her usual trip to China.  DE1 ¶38.   During that time , Dr. Rynn called a meeting with Pamela Bonner, Dr. Jiang's research coordinator.  DE1 ¶61.  Dr. Rynn grilled Bonner about the work done in Dr. Jiang's lab and the

---

[1] See Exhibit 1 to Plaintiff's Response to Defendants' Motion to Dismiss (DE9-1).

work on the REMIT study.  DE1 ¶61.  Bonner told Defendant Rynn that she had no problems with the conduct of research in Dr. Jiang's lab.  DE1 ¶61.[2] Bonner further told Rynn that Dr. Jiang's lab followed all the known rules, that lab best practices and guidelines were evolving, that the lab's data integrity and the data itself could be trusted, that Dr. Jiang had a great deal of personal integrity, and that the only issues Bonner was aware of were documentation issues, resulting from a lack of a trained and experienced clinical research coordinator.  Bonner recommended that for Dr. Jiang's new study that she be given a trained and experienced clinical research coordinator. DE1 ¶¶61-62.

On April 18, 2018, while Dr. Jiang was out of the county, Defendant Rynn instigated a review of the closed file for the REMIT study.  DE1 ¶30.  Dr. Rynn also reduced Dr. Jiang's salary which had been $200,484, effective July 1, 2017, (DE1 ¶28) to $152,630, effective July 1, 2018, (DE1 ¶28).

Upon Plaintiff's return on April 25, 2018, Plaintiff learned of the audit

---

[2] Defendants' have the temerity to state that the "investigations were prompted by concerns expressed by the Clinical Research Coordinator ("CRC") for the REMIT Study, who requested a meeting with Dr. Rynn to express her concerns about the integrity of Dr. Jiang's research." (Id. ¶¶ 39-46.)" DE6 p3. In fact, Plaintiff's Complaint alleges that Dr. Rynn lied when she said that Pamela Bonner "requested a meeting with Dr. Rynn to express her concerns about the integrity of Dr. Jiang's research."

of the REMIT study and sought information from Jeannie Beckham about the reason for the audit. DE1 ¶41. Beckham, who worked for Rynn, told Dr. Jiang that Bonner had made a complaint to Rynn alleging that Dr. Jiang did not know how to manage a laboratory. DE1 ¶42. Dr. Jiang expressed that she wanted to follow up with Bonner, but Beckham instructed her not to do so, because discussing the matter with Bonner could be seen as retaliation. DE1 ¶42. On April 30, 2018, Rynn requested a meeting with Dr. Jiang and suggested to her that the audit would be a good way for Dr. Jiang to improve her research. DE1 ¶43.

The Complaint details the multitude of audits and reviews (DE1 ¶¶45 – 52, 56-59, 66-82) that then followed from the initial clinical research report conducted by the department's CRU, then headed by Defendant Rynn (DE1 ¶54). Defendants' have submitted redacted versions of a selection of some of these reports as exhibits to their memorandum, but not others. These reviews included both a first (DE1 ¶¶50-51) psychiatry CRU review (concluded on May 3, 2018) (**not attached** as an Exhibit by Defendants), and a second (DE1 ¶¶67-82) departmental CRU review (report dated January 18, 2019) (also **not attached** as an Exhibit by Defendants), both of which were overseen by Dr.

Rynn or someone directly supervised by her (attached to this Plaintiff's Response to Defendant's Motion to Dismiss (hereafter Ps Resp to MTD), Exhibit (hereafter Exh) 1 and Exh 3) (DE9-1 and DE9-3).

In the first CRU report (DE9-1)[3] issued on May 3, 2018, this sentence was included at the end:

> Due to the various issues observed during the QA review that may affect data integrity, subject safety and the concern for proper PI oversight it is my recommendation that the study be escalated to Duke's Office of Audit, Risk, and Compliance (OARC). This has been discussed with Dr. Jan Jiang (PI) along with Dr. Moira Rynn (Department of Psychiatry Chair).

Dr. Jiang had not discussed the issue of escalation with the author of the report, however, Dr. Rynn had discussed the general concept of review of the REMIT study with Dr. Jiang on April 30, 2018 (DE1 ¶¶43, 51).

Dr. Rynn used the first CRU report to escalate the review of the REMIT study to the university Office of Audit, Risk, and Compliance (OARC), falsely representing to the OARC that Dr. Jiang had *requested* OARC review. DE1 ¶51; DE6-2 ("At the request of [Moira Rynn] [redacted], M.D. and Wei Jiang,

---

[3] [3]Of significance is the fact that Plaintiff had expressed an interest in the Vice-Chair for Research position previously, DE1 ¶38, and later learned that Rynn had decided not to fill the Vice Chair position, and because of a vacancy in the position of Clinical Research Unit (CRU) Director, Dr. Rynn appointed herself the interim CRU director with no vice-chair, DE1 ¶54. It was as a result of these positions that Rynn was able to accomplish her efforts to discredit Plaintiff with no oversight.

M.D., the [OARC] . . . "assessed compliance with Good Clinical Practice (GCP), applicable U.S. Food and Drug Administration (FDA) regulatory requirements, and institutional policies. . . .")

The OARC initiated its review on June 4 with visits to various locations where REMIT records were kept and reviewed specific study records for 17 of the 310 subjects.   DE1 ¶52; DE6-2, p3. The OARC report (DE 6-3) dated September 12, 2018, concluded that there were no patient safety concerns. (DE 6-3, p2) The study noted only "conflicting information and gaps in documentation" which made it difficult to determine if there was protocol adherence  *Id.*   Significantly, with regard to the exclusion/inclusion criteria, the OARC report noted Dr. Jiang's explanation that "the grant proposal was initially drafted in 2002 when anti-anginal or anti-ischemic medications could be considered just for Beta blockers." *Id.* p 5.   The report also noted that "[e]very reviewed subject in this trial did not wash out from all anti-anginal medications they were taking," and that "only beta-blockers were withheld from reviewed subjects during the assessment period." *Id.* The report admitted that Dr. Jiang and her cardiologist co-investigators explained that they modified the inclusion/exclusion criteria in the original protocol for safety

Case 1:22-cv-00101-LCB-JEP   Document 9   Filed 05/09/22   Page 9 of 33

issues when it became apparent to the investigators "'no physicians would be willing to hold all medications currently considered anti-ischemic medications' because it would be potentially unsafe for patients." *Id.* p6. In addition, the protocol also eliminated the exercise stress testing for some patients. As for deviations from the original 2002 protocol, the OARC report "recommended that eligibility criteria be written and amended in a precise way to accurately capture wash out requirements." *Id.*

As detailed in the October 18, 2018 Response of Dr. Jiang and the study team (P's Response to MTD Exhibit 2) (DE9-2)) created with the assistance of Dr. Steve Boyle, the team addressed all noted gaps in documentation and information, rectified all documentation issues or provided a schedule for doing so, clarified that the protocol exclusion and inclusion criteria had been modified during the study, and directly addressed each element of the OARC findings. (P's Response to MTD Exhibit 2) (DE9-2) including the exclusion criteria related to anti-anginal mediations. Ps Resp to MTD Exh 2, p3 (DE 7-2 p3). As to the amendment of the protocol to eliminate exercise stress testing, this was also due to safety concerns. *Id.* In addition, Plaintiff's response to the OARC report noted that "[n]ot having exercise stress testing had no impact on the

data integrity of the REMIT study's primary goal to evaluate the effects of escitalopram versus placebo on MSIMI. Plaintiff's response also noted: "Withholding beta blockers . . . had little or no effects on mental stress testing responses which are well known not to be characterized by large increases in heart rate. As mentioned, completion of exercise testing was not the primary focus of the study. Thus, we believe that including patients who did not withhold their beta blocker medications had no impact on the primary study goal and did not impact the REMIT data integrity." *Id.*

The OARC report was submitted to the Defendant's Institutional Review Board (IRB) on November 26, 2018, and the IRB reviewed the report on December 19, 2018, and determined that the "safety event" detailed in the report did "not represent an Unanticipated Problem Involving Risk to Subjects or Others (UPIRTSO)." DE6-3, p2. The IRB "concurred with the OARC recommendations and they should be implemented." *Id.* The IRB also concluded that additional information needed to be provided to resolve any outstanding questions regarding "data integrity." *Id.* pp2-3. Specifically, the IRB stated that the "PI and Investigators, with the support of the CRU and School of Medicine, should seek independent expert opinion on these issues

and report back to the Board with their conclusions." *Id.*

On December 22, 2018, the second CRU report was issued. P's Resp to MTD Exh 3 (DE9-3). This report, which was supposed to consider the eligibility criteria for the REMIT study participants also stated that it compared "collected data to the IRB approved protocol and informed consent form (ICF)." DE9-3. Even though the Response provided by the study team to the OARC detailed the changes to the original inclusion/exclusion protocol, the second CRU report ignored the changes to the protocol.

In response, only two days after the study team received the report,[4] the team responded again explaining the inclusion of the participants in both Table 2 and Table 5 and provided explanations for why each subject was properly included, and not excluded, from the REMIT study. P's Resp to MTD Exh 4 (DE9-4). The explanations provided by Dr. Jiang and the study team for the eligibility of all participants demonstrated the subjects' eligibility and inclusion.[5]

Plaintiff's Complaint details the facts relevant to her allegations of

---

[4] The report was actually dated December 22, 2018, but not provided to the team until January 7, 2019.

[5] These same reasons were echoed by her co-investigators in a letter to JAMA dated January 22, 2021. DE9-10

-12-

discrimination and how the audits themselves were instigated based on falsehoods perpetrated by Defendant Rynn and then pursued based on misinformation related to the inclusion/exclusion criteria. In summary, Dr. Rynn lied to Dr. Jiang about the reasons for the first CRU review, telling her that Bonner had complained about Dr. Jiang's research practices, which Bonner denied. DE1 ¶¶41-42, 61-62. Dr. Rynn then pretended to have Dr. Jiang's best interests at heart on April 30, 2018, when she urged Dr. Jiang to not object to the OARC review. DE1 ¶43. Dr. Rynn then falsely represented to the OARC that Dr. Jiang had requested OARC review. DE6-2. Moreover, after the OARC review, the second CRU review intentionally misconstrued the eligibility criteria for participation in the REMIT study and ignored the fact that the original protocol had been revised to allow individuals in multiple categories to participate in the study. DE1 ¶¶ 69-75.

After Dr. Jiang and the study team successfully defended the inclusion of the participants in the study, the IRB reviewed the audits done to date and instructed the "PI and Investigators, with the support of the CRU and School of Medicine, [to] seek independent expert opinion on these issues and report back to the Board with their conclusions." DE6-3. Despite this instruction,

Defendant Rynn, without explanation, forbade Plaintiff from obtaining an "independent expert opinion" on the data integrity issues. DE1 ¶¶ 77, 79-80. On January 23, 2019, Defendant Rynn unilaterally terminated the grant that Plaintiff had received from the NHLBI/NIH in the Fall of 2018. DE1 ¶¶83 – 92. On March 6, 2019, Defendants formally relinquished the funds associated with the grant Plaintiff had been awarded. DE1 ¶103.

Defendant Rynn then cancelled Dr. Jiang's outreach trip to China scheduled for April 2019. DE1 ¶¶ 93-95. Dr. Jiang asked the Faculty Ombudsman to accompany her to a meeting with Dr. Rynn and he witnessed first-hand the hostility with which Defendant Rynn treated Plaintiff. DE1 ¶¶96-99.

Plaintiff learned on March 11, 2019. DE1 ¶102 that Defendant Rynn had also made or caused to be made an allegation of research misconduct against Dr. Jiang to U.S. Department of Health and Human Services (US DHHS) Office of Research Integrity (ORI). DE1 ¶101. The ORI requested Defendants "conduct an inquiry into allegations of possible falsification of the REMIT clinical research records. The purpose of the inquiry would be to determine if there was evidence of potential research misconduct that would warrant an

investigation." DE1 ¶102. The Defendants' Standing Committee on Misconduct in Research (SCMR) was assigned the investigation. *Id.* This investigation was concluded and a report issued October 22, 2019, and it concluded that there had been no research misconduct. DE1 ¶¶ 104-05. Nonetheless, as Plaintiff's Complaint alleges, the SCMR exceeded its charge to investigate whether research misconduct occurred and made allegations of protocol deviations, the same ones that Dr. Jiang and her study team had previously debunked. DE9-2 (Response to OARC Report) and DE9-4 (Response to 2d CRU report). Moreover, the SCMR initiated a statistical re-analysis of the data supporting the 2013 JAMA article and a re-evaluation of the echocardiograms from the REMIT study. DE1 ¶119-23.

Facts related to other discriminatory actions by Defendant Rynn alleged in Plaintiff's Complaint include that in July and again in October 2019, Rynn refused to provide Plaintiff a letter of support for positions to which Plaintiff sought transfer. DE1 ¶¶107-14;DE1 ¶¶115. When Dr. Jiang sought clarification from Defendant Rynn about her actions Rynn informed Jiang that she would not be allowed to undertake any further research activities. DE1 ¶117.

In September 2019, Plaintiff sought a meeting with the IRB to address her concerns that she and her co-investigators were not being permitted to obtain independent expert evaluations of the REMIT study data, as the IRB directed in December 2018, DE1 ¶¶123-28, DE6-3. In October 2019, Dr. Jiang expressed her concerns about the re-evaluations of the data by the SCRM and the lack of independence of those re-evaluations. DE1 ¶¶129-33. On October 22, 2019, the SCRM released its report and again, exceeding its charge, made multiple recommendations even though it concluded that there was no research misconduct. DE1 ¶¶134-35.

On November 20, 2019, Dean Klotman issued a determination which included the recommendation of the SCRM, DE1 ¶135, making recommendations which governed Plaintiff's future research. DE1 ¶¶140, 143; DE9-5. On January 29, 2020, Defendant Rynn then took additional adverse actions against Plaintiff which effectively ended Plaintiff's research career. DE1 ¶¶143-44; DE9-6.

Plaintiff appealed to Dean Klotman who on May 29, 2020, ratified Defendant Rynn's decision. DE1 ¶¶148.

Finally, and completely ignored by Defendants' are Plaintiff's allegations

in her Complaint, DE1 ¶150-51, regarding Plaintiff's trips to China. In December 2018, and again in February, 2019, Defendant Rynn and other Defendants made inquiries to Plaintiff regarding her trips/travels to China insinuating they were improper. These allegations are specifically connected to Plaintiff's race and national origin, and demonstrate that the Defendants were very cognizant of Plaintiff's race and national origin. Moreover, the fact that Defendants have not proffered any individuals who are male, younger, and non-Asian who have undergone the same kind of research scrutiny as Plaintiff speaks volumes about Defendants' inability to show that any other individuals, similarly situated to Plaintiff, were treated in a similar fashion.

## ARGUMENT

### I.  Plaintiff's allegations of discrimination are sufficient to survive Defendants' Rule 12(b)(6) motion to dismiss.

Defendants' make three arguments as to why Plaintiff's intentional discrimination claims fail:  first, that she makes conclusory allegations of discrimination; second, that she makes conclusory allegations of a hostile work environment; and third, that Defendants Klotman and Rynn have no individual liability.

"A motion to dismiss pursuant to Rule 12(b)(6) must be read in

conjunction with Federal Rule of Civil Procedure 8(a)(2)." *Hilderbrand v. Pelham Transportation Corp.*, No. 1:20CV1020, 2021 WL 2681966, at *3 (M.D.N.C. June 30, 2021). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests . . . ." *Twombly*, 550 U.S. at 555. Plaintiff has unquestionably provided a statement of her claims sufficient to let Defendants know that her claims rest upon the actions taken by Defendant Rynn and ratified by the other Defendants which resulted in numerous adverse actions against Plaintiff and that these actions involve intentional discrimination and the creation of a hostile work environment violation of Title VII, the ADEA, and Section 1981. Plaintiff has provided Defendants "[f]air notice . . . by setting forth enough facts for the complaint to be 'plausible on its face' and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . .'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Defendants' deny that the audits concerning the REMIT study were motivated by discriminatory intent, but, "Rule 12(b)(6) does not countenance .

. . dismissals based on a judge's [or a defendant's] disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416, U.S. 232, 236 (1974)). Plaintiff "is entitled to show that [Defendants'] proffered reason was not the true reason" for its adverse action. *See Sonnichsen v. Sears, Roebuck & Co.*, 105 F.3d 648 (4th Cir. 1997).

"In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the [ adverse action] are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)). Plaintiff has alleged facts sufficient to show that the Defendants' reasons for the adverse actions taken against her changed over time, from initial criticisms of the documentation in the REMIT study , to later criticisms of the inclusion of certain study subjects. *Id.* ("This Court has allowed an inference of pretext in cases where an employer has made substantial changes to its proffered reason for discharge over time.") (citing *EEOC v. Sears Roebuck & Co.* and *Wesley v. Arlington Cnty.*, 354 F. App'x 775, 782 (4th Cir. 2009)).

Plaintiff has also alleged that the factual basis for the adverse actions

taken against her were false and based on misapprehensions of the applicable scientific principles. "Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Id.* At this stage, Plaintiff's factual allegations that Defendant lied about the initial reason for its scrutiny of Plaintiff's study and the adverse actions which resulted from such scrutiny, and, that the scrutiny and adverse actions were motivated by her race, national origin, age, and race are sufficient to overcome Defendants' motion to dismiss.

A. <u>Plaintiff's allegations that she was treated differently from other individuals supervised by Defendants are sufficiently specific to meet her pleading burden under Rule 8(a)(2) and Rule 12(b)(6).</u>

Plaintiff's complaint implicitly and explicitly alleges that no other non-Asian, male, or younger researchers have had their concluded research activity so scrutinized for errors especially many years after the fact. Indeed, Defendants have provided no examples of how such scrutiny is commonplace and the evidence, at this stage, is all within Defendants' knowledge. Plaintiff's own knowledge of how others in her department have (and have not) been treated by Rynn provides a sufficient factual basis to support her allegations that she was treated differently from her counterparts. The mere fact that

Defendant Rynn lied about the impetus for initiating the scrutiny of Plaintiff's research, is sufficient factual evidence to support Plaintiff's allegations that she was treated differently because of her race, national origin, age, or sex.

In *Mc McLeary-Evans v. Md. DOT,* 780 F.3d 582, 585-86 (4th Cir. 2015), the plaintiff's complaint, alleged that she was denied promotion based on her race, [but] contained no allegations about the individuals hired to fill the position. Plaintiff only alleged that she was not selected for promotion by individuals of a different race and that the department in which she worked had a history of hiring White males and females.

In this case, Plaintiff has alleged that prior to Defendant Rynn's becoming department head, her salary each year was increasing and since her advent, Plaintiff's salary has decreased precipitously. DE1 ¶¶27-32. . Defendant Rynn lied about Bonner's complaints in order to justify an audit of the REMIT study, the outcome of which Defendant Rynn controlled, which found documentation deficiencies. DE1 ¶¶39-34. Plaintiff alleges that these actions were discriminatory and that she was treated differently than other individuals similarly situated to her. DE1 ¶44 Defendant Rynn then escalated the audit for additional reviews, which were also based on false allegations,

to-wit, that Plaintiff sought additional review and that the deficiencies were significant DE1 ¶¶45-63. These allegations are far more substantial than the allegations in *McCleary-Evans* and are not "conclusory." *See also Sanzi v. XPO Logistics, Inc.,* No. 1:21CV33, 2022 WL 613380, at *2 (M.D.N.C. Mar. 2, 2022) (holding that plaintiff "alleged facts sufficient to show that he was treated differently than similarly situated employees outside of his protected class" when he alleged that he was excluded from emails and meetings, that he received smaller and less lucrative accounts, and that he was paid less than other comparable, non-Brazilian, U.S. Born team members).

B. <u>Plaintiff's allegations regarding the factual specifics of her hostile work environment are sufficient under Rule 8(a)(2) and 12(b)(6).</u>

The facts needed to allege a hostile work environment under Title VII, Section 1981, or the ADEA are the same. *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *see also Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495 (4th Cir. 2015) ("The elements an employee must prove are the same under either [Title VII or Section 1981].") Employers are generally presumed to be liable for hostile work environment harassment committed by supervisory employees. *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 299 (4th Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764, 118 S.Ct.

2257, 141 L.Ed.2d 633 (1998)).  In *White*, the Fourth Circuit denied the employer's attempt to use its distribution of an anti-harassment policy as an affirmative defense because 1) plaintiffs were able to show "tangible employment actions" and 2) issues of material fact existed as to whether the policy was effectively enforced and whether the employer took reasonable care to prevent and promptly correct harassing behavior.  *Id.* at 299-300.

In Plaintiff's complaint, she alleges that after Defendant Rynn threatened to terminate her latest NIH grant, Tom Metzloff, faculty ombudsman agreed to meet with her and Defendant Rynn and he witnessed Defendant Rynn's hostility towards Plaintiff.  DE1 ¶¶93-99.  This encounter should have been enough to put Defendants on notice of both the hostile work environment to which Plaintiff was being subjected as well as their duty to protect Plaintiff from the obviously hostile treatment by Defendant Rynn.  Defendants' failure to take any action to do so  makes out a prima facie case of hostile work environment.

As Justice O'Conner noted in *Harris v. Forklift Systems*, 510 U.S. 17 (1993), "Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one

that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22. Further, she noted that "[t]he appalling conduct alleged in *Meritor* . . . merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable." *Id.*

Plaintiff's factual allegations of a hostile work environment are far from "conclusory:" the facts alleged include the initiation of the attack on her research by Defendant Rynn, Rynn's continued pursuit of these attacks, her relentless and dogged attack on Plaintiff's trips to China, along with her refusal to provide any references on behalf of Plaintiff for different positions within Duke, her serious salary cut , her efforts to have JAMA retract the REMIT study articles. These macro- and micro-aggressions should compel this Court, at least on this motion to dismiss, to note the "constellation of surrounding circumstances," and to apply "common sense" to "look beyond the 'simple recitation of the words used'" by Defendants to conclude that Plaintiff has made sufficient factual allegations of specific acts by Defendant Rynn, and ratified by the remaining Defendants, and which constituted a hostile work

environment for Plaintiff based on her race, national origin, sex, and age. *See Bockman v. T & B Concepts of Carrboro, LLC*, No. 1:19CV622, 2020 WL 5821169, at \*17 (M.D.N.C. Sept. 30, 2020) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82 (1998))(holding words need not explicitly or implicitly invoke protected categories to allow an inference of intentional discrimination based on protected categories).

C. <u>Defendants Klotman and Rynn were personally involved in the purposeful, discriminatory adverse actions taken against Plaintiff.</u>

Defendants' third argument that Defendants Klotman and Rynn have no individual liability under Section 1981 fails because because they were "personally involved in purposeful, discriminatory actions." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 283 (E.D.N.C. 2016), *aff'd,* 986 F.3d 332 (4th Cir. 2021)(holding "[p]ersonal liability under section 1981 must be predicated on the actor's personal involvement.") Plaintiff has alleged that not only did Defendant Rynn have the authority to take the adverse actions against her, DE1 ¶143; DE9-6, but that when Plaintiff sought to appeal to Defendant Klotman, she refused to reverse them even though her original recommendations had been much less harsh, DE1 ¶¶135, 140, 148-49. These factual allegations of personal involvement by Defendants Rynn and Klotman

are sufficient to survive Plaintiff's motion to dismiss them as defendants under Plaintiff's Section 1981 claim.

## II. Plaintiff's allegations of retaliation under Title VII, the ADEA, and 42 U.S.C. § 1981 are also sufficient to withstand Defendants' motion to dismiss.

Plaintiff involved the faculty ombudsman to address her perception that Defendant Rynn was actively hostile towards her as early as February 2019, when Rynn refused to allow Plaintiff to travel to China, but prior to Defendant Rynn making good on her threats to terminate Plaintiff's NIH grant. DE1 ¶¶ 94-99. The subsequent termination of Plaintiff's grant demonstrates retaliation.

In addition, Plaintiff's counsel notified Defendants of her claims by letter dated November 12, 2020. P's Resp to MTD Exh 7 (DE9-7). Plaintiff filed her charges of discrimination in November 30, 2020 which put all Defendants on notice of her allegations. P's Resp to MTD Exh 7 (DE9-7). Undeterred, on December 18, 2020, even though Plaintiff had provided a detailed explanation of why the study did not contain errors DE9-2; DE9-4, Defendants continued their assault on Plaintiff's professional reputation by writing to JAMA, seeking retraction of the article published relating to the REMIT study. P's Resp to

MTD Exh 9 (DE9-9). On January 21, 2021, Chris O'Connor, speaking on behalf of all of the co-investigators on the REMIT study, also notified JAMA that the letter from Scott Compton (DE9-9) written with the knowledge and consent of Defendants was "troubling in many regards." P's Resp to MTD Exh 10 (DE9-10). Thus, Plaintiff has alleged sufficient facts showing that she engaged in protected activity at the very least beginning in February 2019 when she involved the faculty ombudsman who witnessed the hostile treatment of Plaintiff and continuing through the filing of her EEOC charge after which Defendants continued to take adverse actions against Plaintiff. Defendants' statement that "[t]he Complaint fails to allege that Dr. Jiang engaged in any protected activity" is without merit.

Defendants then posit that even if the Complaint alleged protected activity, Plaintiff has failed to connect the adverse actions to her protected activity. In fact, connection can be inferred from temporal proximity.[6] *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998); *Woods v. Salem Elec. Co., No.* 1:15CV525, 2017 WL 74271, at *7 (M.D.N.C. Jan. 6, 2017) (finding prima facie

_____

[6] Although to be clear, whether Defendants were simply engaging in additional discrimination against Plaintiff because of her race, national origin, sex and age, or if they were retaliating against her and upping the ante by taking their discriminatory actions towards Plaintiff outside of the institution is unclear.

case of retaliation where plaintiff filed EEOC charge and was terminated one month later). Plaintiff, through counsel, at the very latest put Defendants on notice of Plaintiff's belief that Defendants were discriminating against her on November 12, 2020, and then on November 20, 2020, when she filed her charge of discrimination. Nevertheless on December 18, 2020, Defendants wrote the editor of JAMA calling into question the legitimacy of the article regarding the REMIT study.

### III. Plaintiff's claim for conspiracy should not be dismissed if Plaintiff can amend her claim to state a viable claim under 42 U.S.C. § 1985 and § 1986.

Defendants make several arguments that Plaintiff's section 1985(3) claim fails as a matter of law. One of these arguments is the intracorporate immunity doctrine. But Plaintiff's allegations that Defendants Rynn and Klotman conspired against her is not defeated by this doctrine.

"The law is well settled that to establish a cause of action for conspiracy to deny civil rights under § 1985(3) a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to

the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *McHam v. N. Carolina Mut. Life Ins. Co.*, No. 105CV01168, 2007 WL 1695914, at *4 (M.D.N.C. June 11, 2007), *aff'd*, 250 F. App'x 545 (4th Cir. 2007) (citing *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir.1995)).

Plaintiff's allegations in her complaint show that these elements were met over a two-year period, when Defendant Rynn and multiple individuals, including those she supervised and those with whom she had influence, by overt acts, i.e, instigating and continuing the unusual scrutiny of the long-concluded REMIT study, with the outcome of discrediting Plaintiff's skills and expertise and ending Plaintiff's research career, because she was not White, male or young. The fact that these efforts were largely hidden until January 2021 when they were revealed to and described by Plaintiff's co-investigators as "troubling" also shows that a conspiracy existed and was perceived by others.

The standard for a section 1985 claim to survive past *summary judgment* is steep in this Circuit. *See Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) ("This Court, under that standard, has rarely, if ever, found that a plaintiff has

set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion.")  But Plaintiff is at least entitled to have her claim withstand a motion to dismiss given the facts alleged which show the efforts by Defendant Rynn and others to join together in their acts to discriminate against Plaintiff.

To the extent the Court finds the conspiracy pleadings inadequate, they can be cured by amendment to allege that Defendant Rynn conspired with specific individuals in violation of section 1985 and that Defendant Klotman, even if she was not a primary conspirator in the efforts to discredit Plaintiff using the REMIT study audits, at least violated section 1986 because she had the power to prevent the conspirators from acting but failed to do so.  *Id.* at *5 ("Section 1986 imposes liability on those who know of conspiracies as described in section 1985 and who have the power to prevent the conspirators from acting but who fail to do so.")  Plaintiff has alleged or can amend her Complaint to allege that the audits were **not** "independent, parallel actions that were taken by multiple individuals in connection with the investigation" as argued by Defendants. Likewise, Plaintiff can amend her complaint to delete the conspiracy claims against Defendants Duke and DUHS.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

Respectfully submitted, this the 9th day of May 2022.

/S/ VALERIE BATEMAN
NC State Bar: 13417
T:  919-810-3139
NEW SOUTH LAW FIRM
209 Lloyd St., Ste 350
Carrboro, NC  27510
valerie@newsouthlawfirm

/S/ JUNE ALLISON
NC State Bar: 9673
T:  704-277-0113
NEW SOUTH LAW FIRM
233 Laurel Avenue
Charlotte,  NC  28207
June@newsouthlawfirm

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **RESPONSE TO DEFENDANTS' MOTION TO DISMISS** using the CM/ECF filing system which will automatically send email notification of such filing to the all counsel of record.

This the 9th day of May 2022.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM

## CERTIFICATE OF WORD COUNT PURSUANT TO LR 7.3

The undersigned hereby certifies that the foregoing Memorandum in Support of Defendants' the Motion to Dismiss Pursuant to Rule 12(b)(6) consists of less than 6,250 words, exclusive of the caption, signature lines, certificate of service, and the certificate of word count, and thus complies with Local Rule 7.3(d).

This the 9th day of May 2022.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM